UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| RONALD GLASS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:14-cv-00081-SEB-DML |
| | ) | |
| REVERE PLASTICS SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 94], filed on October 17, 2016.[1]  Plaintiff, Ronald Glass, proceeding *pro se*, has brought this action against his former employer, Revere Plastics System ("Revere"), alleging that Revere discriminated against him in the workplace and ultimately terminated his employment because of his race (African-American) and age (forty-nine) and also retaliated against him, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA").  Although not entirely clear, it appears Mr. Glass has also brought a state law claim for workers' compensation retaliation.  For the reasons detailed below, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

---

[1] Defendant originally filed its motion for summary judgment on March 9, 2016 [Dkt. No. 61]. However, on September 15, 2016, the Court stayed that motion pending the filing of a revised motion and accompanying briefing responsive to the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).  We have before us now that revised motion.

## Factual Background

Revere is a custom plastic injection and insert molder, supplying plastic injection molded parts throughout the United States to the major appliance industry as well as other markets, including the automotive, business equipment, power equipment, and electrical and electronic industries.  In January 2012, Mr. Glass was hired by Revere to work in its Jeffersonville, Indiana facility as a Quality Control Associate.  Revere's Jeffersonville facility operates approximately 30 molding machines on three shifts, producing plastic components and assemblies for General Electric ("GE") appliances, among others.  When he was hired, Mr. Glass was paid at the rate of $11.00 per hour. Glass Dep. at 65.

### Plaintiff's Promotion

In May 2012, Mr. Glass was promoted to the position of Shipping and Receiving Lead and began making $17.00 per hour.  *Id.* at 71.  In that role, Mr. Glass was responsible for overseeing the shipping and receiving of raw materials and finished goods, maintaining inventory, and processing associated records and invoices.  Exh. A to Fountain Decl.  As Shipping and Receiving Lead, Mr. Glass reported directly to Randy McAllister, Revere's Materials Department Manager.  *Id.*

### Issues in Shipping and Receiving

A few months following Mr. Glass's promotion, Melinda Mesbahi, Revere's Accounts Payable Analyst, began documenting a number of irregularities relating to invoices in shipping and receiving.  Ms. Mesbahi emailed Mr. Glass and Mr. McAllister several times between October and December 2012 regarding problems she had detected

with invoices.  Exh. B to Fountain Decl.  Ms. Mesbahi outlined the parts problems and shipping mistakes she had discovered in her emails which included at least thirty-one (31) shipping and receiving errors resulting in unpaid invoices in mid-October 2012; sixteen (16) additional shipping and receiving errors resulting in unpaid invoices by late November 2012; thirty-one (31) new shipping and receiving errors, plus two continuing issues, resulting in unpaid invoices by mid-December 2012; and forty-two (42) more shipping and receiving errors, in addition to thirteen (13) continuing issues) that resulted in unpaid invoices by late December 2012.  *See id.*

**Plaintiff's Demotion**

Although these problems had been brought to the attention of Mr. Glass and Mr. McAllister on several occasions, they persisted.  According to Revere, the shipping and receiving errors resulted in a sharp decline in customer service and satisfaction, requiring the company in early January 2013 to terminate Mr. McAllister and to later terminate Dave Eagan[2] (another manager in the shipping and receiving department), and demote Mr. Glass to the position of Shipping and Receiving Associate, which reduced his pay to $11.00 per hour.  *See* Exh. C to Fountain Decl.  After Mr. McAllister was terminated, Joy Bruner became the Materials Department Manager.

Mr. Glass received a disciplinary notice on January 2, 2013 informing him of his demotion.  That notice provided in part as follows:

> Since you have been in the role [of Shipping and Receiving Lead], several issues have been noticed:

---

[2] Mr. McAllister and Mr. Eagan are white men and were 59 and 63 years of age, respectively, at the time they were terminated.

- Product is not being received in a timely manner, which affects purchasing and accounting at corporate
- You have not exhibited a teamwork type attitude towards others
- The warehouse is in a continuous state of disarray.

Exh. C to Fountain Decl.  Although Mr. Glass acknowledges that there were serious problems in Shipping and Receiving, he maintains that other employees as well as the computer system were to blame for the mistakes and that by December 2012 he had actually fixed the paperwork problems.  Glass Dep. at 72, 91.

After his demotion, Mr. Glass applied for a number of supervisory positions, but never received another promotion.  Mr. Glass testified that he is unable to recall all of the specific positions for which he applied, who the other applicants were, or who ultimately was hired into those positions.  *Id.* at 199-200.

**Improvements in Shipping and Receiving**

Mr. Glass has submitted a number of emails sent among members of Revere's management from January 2013 to November 2013 that appear to show that the issues in Shipping and Receiving continued for a number of months after Mr. McAllister and Mr. Eagan were terminated and Mr. Glass was demoted.  *See* Pl.'s Exh. 2.  However, by January 31, 2014, Ms. Bruner received praise from a representative of GE, one of Revere's main customers, in response to improvements in Revere's shipping and receiving.  Specifically, Vickie Evans, GE Appliance and Light Consultant, stated:

> I just need to say, that Joy since you took over working with us and Revere things have been great.  Before it was constant problems.  I'm sure [Melanie Deutsch] will agree with me.  Just wanted to say thanks – I know you work hard.

Exh. D to Fountain Decl. Melanie Deutsch, also from GE, responded:

> I totally agree. We have had issues, but not receiving the shipments, or getting calls for them not showing up. Everyone has been doing a wonderful job. I appreciate everyone working as a team.

*Id.*

## Plaintiff's Discipline

In the months following his demotion, Mr. Glass received a number of disciplinary write-ups issued by Ms. Bruner. On January 11, 2011, Ms. Bruner issued a verbal warning to him for failing to follow instructions based on his having spent too much time on the shop floor and not enough in the Shipping and Receiving Department. Exh. E to Fountain Decl. Mr. Glass received a verbal warning for carelessness on February 5, 2013, after he collided his fork lift with another employee's vehicle. Exh. F to Fountain Decl. On May 4, 2013, Mr. Glass was issued another verbal warning for failure to follow instructions after the wrong product was delivered to a press operator. Exh. G to Fountain Decl. On June 12, 2013, Mr. Glass was instructed to personally deliver parts to GE that were urgently needed. Exh. H to Fountain Decl. After he delivered the wrong parts, he again received a verbal warning, this time with the admonition that "[a]ny further disciplinary action may result in or up to and not excluding termination." *Id.* On that same day, a white employee, Eric Amy, received the same discipline for a similar error, to wit, delivering the wrong parts. Exh. I to Fountain Decl.

Although Mr. Glass does not deny that he made the mistakes upon which these disciplinary measures were based, he contends that the write-ups he received were nonetheless "frivolous" and motivated by discriminatory animus. Glass Dep. at 114.

However, Mr. Glass did not raise the issue of discrimination at the time he was disciplined or mention discrimination in the space on the disciplinary form provided for "Employee Remarks." *See* Exhs. F, G, H to Fountain Decl.

**Plaintiff's Internal Complaints**

Not until April 24, 2013, did Mr. Glass inform Craig Kellogg, Revere's President, in Clyde, Ohio, in an email, that he believed his January 2013 demotion and his rejection for a Purchasing Agent position in April 2013, were the results of race discrimination. Exh. J to Fountain Decl. at 2. Mr. Kellogg immediately responded to Mr. Glass's email, stating: "At Revere we take our objectives, Beliefs and Values and Guiding Principles very seriously. Any act of discrimination is acted upon immediately and severely." *Id.* Mr. Kellogg instructed Danny Neff, the General Manager of the Jeffersonville facility, and Shannon Robinette, the Human Resources Manager at Jeffersonville, to conduct an investigation. *Id.*

In conducting her investigation, Ms. Robinette reviewed the documentation underlying Mr. Glass's demotion and also reviewed the applications of those who had applied for the Purchasing Agent position. Following that review, Ms. Robinette and Mr. Neff met with Mr. Glass on May 1, 2013 to discuss Mr. Glass's concerns. Ms. Robinette informed Mr. Glass that, based on her investigation into his complaints, she had found no evidence of discrimination related to his demotion, explaining that the evidence indicated he had been demoted because of documented performance problems in the department when he served as Shipping and Receiving Lead. *See* Exh. K to Fountain Decl.; Exh. B to Fountain Decl. With regard to the Purchasing Agent position, Ms. Robinette explained

that neither Mr. Glass nor any other internal applicant was chosen for the position because an external candidate was selected who, unlike Mr. Glass and the other internal candidates, had considerable experience in purchasing. Exh. K to Fountain Decl. Before concluding the meeting, Ms. Robinette asked Mr. Glass whether he had any other concerns or could identify any other employees who believed they had suffered from discrimination. Mr. Glass stated that he had nothing more to discuss. *Id.*

A few months later, on June 14, 2013, and two days after Mr. Glass had received the verbal warning discussed above for delivering the incorrect parts to GE, he complained to Ms. Bruner and Ms. Robinette that he felt "singled out" in receiving this discipline. Ms. Bruner and Ms. Robinette reiterated to Mr. Glass that he had been disciplined because his failure to deliver the correct part had generated a complaint from GE. Ms. Bruner and Ms. Robinette further informed Mr. Glass that, on the same day he was disciplined, a white employee, Eric Amy, had also received a verbal warning for a similar mistake. *See* Exh. L to Fountain Decl.

Later that same day, Mr. Glass emailed Mr. Kellogg stating that "the last meeting [with Ms. Robinette] did not go well," that he was "threatened" at the meeting, and that "nothing has change[d] but only got[ten] worse." Exh. M to Fountain Decl. After receiving Mr. Glass's email, Mr. Kellogg contacted Ms. Robinette, who recounted her version of the meeting. On June 17, 2013, Mr. Kellogg responded to Mr. Glass by email, informing Mr. Glass that he had spoken with Ms. Robinette and that her perception of the meeting was "different than your attached note." *Id.* Mr. Kellogg asked Mr. Glass to

meet again with Ms. Robinette and Mr. Neff and also contacted Revere's Corporate Human Resources Director, Chris Yurkovich, regarding the issue.

On June 20, 2013, Ms. Robinette and Mr. Yurkovich met with Mr. Glass to further discuss his concerns. Mr. Glass stated that he felt threatened by comments that had been made at the May 1 meeting with Ms. Robinette and Mr. Neff and that those comments, combined with the June 14 verbal warning, made him feel as though he was being "targeted." Although he could not provide any specific examples, Mr. Glass also reported that he felt that the attendance policy was being applied unfairly and supervisors were not issuing attendance points to their "favorites." When Mr. Yurkovich asked if there were any other issues that Mr. Glass wanted to have investigated, Mr. Glass replied that there was nothing else.

On June 26, 2013, Mr. Glass emailed Mr. Yurkovich thanking him for "taking the time to listen and try[ing] to clear this matter up." Exh. N to Fountain Decl. However, in that same email, Mr. Glass again complained about his January demotion, claiming that he "did not receive proper process." *Id.* He requested that he be given documentation regarding the problems in shipping and receiving that led to his demotion. Ms. Robinette subsequently provided Mr. Glass with the documentation she had reviewed during her investigation and instructed him to ask her directly if he needed anything further. Exh. O to Fountain Decl.

In response to Mr. Glass's concerns, Mr. Yurkovich interviewed Mr. Neff and Ms. Robinette about the May 1 meeting. With regard to the attendance policy issue, Mr. Yurkovich chose a random sample of employees and compared their time records with

their attendance point records, confirming that those records were consistent. Mr. Yurkovich met with Mr. Glass in July 2013 and reported that he had found no evidence of favoritism in enforcing the attendance policy.

A few months later, in September 2013, Mr. Glass sent several more emails to Mr. Yurkovich as well as other members of management complaining generally about unspecified acts of "discrimination" and "racism." The only specific example cited by Mr. Glass was his claim that African-American employees were drug-tested after on-the-job accidents while white employees were not. According to Mr. Glass, in February 2013, he and a white employee, Kyle Dalton, were involved in a collision where they ran into one another with their forklifts and, after the incident, he was drug-tested while Mr. Dalton was not. Mr. Glass further alleged that an African-American employee, Shaun Bryant, and a white employee, Misty Clifton, were both involved in slip-and-fall accidents, but Revere required only Mr. Bryant to submit to a drug test following his accident.

Upon receipt of Mr. Glass's email, Mr. Yurkovich reviewed the records from the accidents cited by Glass to determine if there had been a drug testing discrepancy. Revere's Abuse of Drugs and Alcohol Policy provides that employees are sent for drug testing when they are "involved in on-the-job accidents, which cause physical injury or property damage." Exh. P to Fountain Decl. With regard to Mr. Glass and Mr. Dalton's forklift accident, Mr. Yurkovich found that Revere's records reflected that, contrary to Mr. Glass's understanding, both men were drug tested immediately after the collision and thus there was no evidence of disparate treatment. As for the slip-and-fall accidents, Mr.

Glass was correct that Mr. Bryant was drug tested following his accident and Ms. Clifton was not. However, Revere's records showed that Mr. Bryant was drug tested because his accident resulted in a physical injury that required medical treatment, whereas Ms. Clifton's slip and fall did not result in an injury requiring medical treatment and therefore did not require a drug test. Based on this information, Mr. Yurkovich concluded that the company's drug policy had been properly and fairly followed.

**Plaintiff's Termination**

In February 2014, Mr. Glass requested and was granted leave under the Family and Medical Leave Act ("FMLA") to undergo shoulder surgery to treat a non-work-related injury. Exh. R to Fountain Decl. When Mr. Glass returned to work several months later, he was still taking Norco, a heavy pain medication (acetaminophen/hydrocodone), but failed to inform Revere of this fact. Glass Dep. at 11.

On Wednesday, October 1, 2014, having returned to work following his shoulder surgery, Mr. Glass requested and was given permission to leave work early because he was experiencing neck and back pain. He took a sick day the next day, and returned to work on Friday, October 3, 2014 and Saturday, October 4, 2014 as well. He was not scheduled to work on Sunday. Glass Dep. at 132.

On Monday, October 6, 2014, Mr. Glass clocked in for the night shift at 10:47 p.m. However, due to back pain, he never actually started working. Around 11:30 p.m., he decided to leave work and texted his supervisor, Ms. Bruner, and Material Manager Gene Douglas, stating: "Hey Joy and Gene [sic] I'm not doing to[o] well I can't even

hardly move from side to side or look up, I have [a] doctor[']s appointment at 9:15 in the morning[. I] may leave here[e] and go home and lay back down." Exh. T to Fountain Decl. Because both Ms. Bruner and Mr. Douglas worked the day shift at that time, neither received Mr. Glass's text until the next morning.

Mr. Glass concedes that Revere's policy requires an employee to receive permission from a supervisor before leaving early and that Third Shift Supervisor Sean Howard was in charge on the night shift. Mr. Glass had spoken with Mr. Howard earlier that evening and knew he was in the building. Revere contends that, instead of speaking with Mr. Howard directly to ask permission to leave early, Mr. Glass clocked out at 11:38 p.m. and texted Mr. Howard at 11:39, p.m., stating, "Hey Sean I'm going home already told Joy and Gene." Exh. U to Fountain Decl. According to Mr. Glass, he went to his car around midnight and left shortly thereafter. Glass Dep. at 140. At 12:23 a.m., Mr. Howard acknowledged receipt of Mr. Glass's text. Exh. V to Fountain Decl. At 6:19 a.m., Mr. Howard emailed Revere's Human Resources Manager, Carol Fountain, stating: "Our 3rd shift forklift driver [Mr. Glass] went home around 1135 or so[.] [I]t wasn't until the 2nd shift forklift driver said something to me did I know that Ron Glass left. He did send me a text stating that he was leaving and that he told Joy and Gene." Exh. W to Fountain Decl. However, Mr. Glass has submitted the declaration of James Burch, the second shift forklift driver that night, who testified that Mr. Glass "approached Sean Howard and me and let us know he was leaving early." Dkt. 98-1 at 2. Mr. Burch does not testify regarding his recollection of the time this conversation occurred.

Later that morning, on October 7, 2014, Mr. Glass telephoned Ms. Fountain to inform her that he needed to file a workers' compensation claim. Ms. Fountain sent him to Business Health Plus, where he was examined by Dr. Pennington, who told Mr. Glass that his back problem reflected a pre-existing condition.[3] Ex. X to Fountain Decl. As a result of his visit with Dr. Pennington, Revere first learned that Mr. Glass was still taking Norco for pain while he was operating heavy machinery, including presses and forklifts. Following his exam by Dr. Pennington, Mr. Glass told Ms. Fountain that he was unable to work because of his back problems, so Ms. Fountain sent him home.

Over the course of the following days, Revere investigated the circumstances surrounding Mr. Glass's departure from work on the night of October 6, which culminated in a determination that Mr. Glass had violated the Company's policy that prohibits employees from leaving work after starting a shift without first receiving permission. According to Revere, this policy is strictly enforced because the Company must account for all of its employees in case of an emergency. On October 10, 2014, Mr. Glass was called in by his supervisors and informed that his employment was being terminated for job abandonment. Exh. Y to Fountain Decl.

**The Instant Litigation**

On July 30, 2014, after receiving his notice of right to sue from the Equal Employment Opportunity Commission ("EEOC"), Mr. Glass filed his *pro se* complaint in

---

[3] Mr. Glass claims that Dr. Pennington provided a false and fraudulent diagnosis at Revere's request.

this court, alleging that Revere had subjected him to discrimination and retaliation in violation of Title VII and the ADEA. Mr. Glass has also asserted a state law claim for workers' compensation retaliation. Revere has moved for summary judgment on Mr. Glass's claims to which motion Mr. Glass has responded. The motion is now fully briefed and ripe for ruling.

## Legal Analysis

### I. Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*,

246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999);

*Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment

discrimination cases, because intent and credibility are such critical issues and direct

evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757

(7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that

end, we carefully review affidavits and depositions for circumstantial evidence which, if

believed, would demonstrate discrimination. However, the Seventh Circuit has also

made clear that employment discrimination cases are not governed by a separate set of

rules, and thus remain amenable to disposition by summary judgment so long as there is

no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections,

Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

Mr. Glass's claims of racial and age discrimination and retaliation under Title VII

and the ADEA invoke the Seventh Circuit's recent decision in *Ortiz v. Werner

Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). In *Ortiz*, the Seventh Circuit eliminated

the sub-methodologies and analytical divisions of evidence which had developed under

the so-called direct method of proof to replace that "rat's nest surplus of 'tests'" with a

single issue: "whether the evidence would permit a reasonable factfinder to conclude that

the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge

or other adverse employment action." 834 F.3d at 765, 766. Under this new,

"simplified" approach, the "[e]vidence must be considered as a whole, rather than asking

whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

The *Ortiz* court noted that its decision did "not concern *McDonnell Douglas* or any other burden-shifting framework." *Id.* at 766. However, in the short period of time since that decision, the Seventh Circuit has stated that the straightforward inquiry in *Ortiz* has, indeed, "replaced the notion of two distinct *methods of proof* – the 'direct' and 'indirect.*" Harris v. Office of the Chief Judge of the Circuit Court of Cook Cnty.,*—Fed. Appx.—, 2016 WL 7228703, at *2 (7th Cir. Dec. 13, 2016) (emphasis added). Under the *McDonnell Douglas* test to establish a prima facie case of discrimination a plaintiff must offer evidence that: (1) he is a member of a protected class, (2) his job performance met the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (citation omitted). Once a prima facie case is established, a presumption of discrimination is triggered. The burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas,* 411 U.S. at 802. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination. *Id.* at 804.

We struggle to reconcile the Seventh Circuit's clear preference for a single, simplified approach in analyzing claims of discrimination with the continued existence and applicability of the Supreme Court's directives in *McDonnell Douglas*. To do so, we shall

view *McDonnell Douglas* as simply one pattern – one of many – superimposed on the evidence in an effort to enable a reasonable trier of fact to determine discrimination. *See Knapp v. Evgeros, Inc.*,—F. Supp. 3d—, 2016 WL 4720026, at *6 (N.D. Ill. Sept. 9, 2016). However, a district court need not limit itself to analyzing the evidence only according to the *McDonnell Douglas* template, nor should it be bound by the formulaic foxtrot which has developed under that framework.

## II.    Discussion

### A.    ADEA and Title VII Discrimination Claims

Mr. Glass alleges that he was demoted and subsequently terminated because of his age and race, in violation of the ADEA and Title VII, respectively. Mr. Glass cannot bring an independent discrimination claim based on his January 2, 2013 demotion, however, because he did not file his charge with the EEOC until November 21, 2013, more than 300 days after he was demoted. It is well-established that "claims under Title VII [and the] ADEA … must be brought within 300 days of the alleged unlawful employment practice." *Fiona Feng Chen v. Northwestern Univ.*, 175 Fed. App'x 24, 26 (7th Cir. 2005) (citations omitted). Accordingly, Mr. Glass's Title VII and ADEA discrimination claims based on his demotion do not survive summary judgment.

This does not mean, however, that Mr. Glass's demotion and the facts surrounding that employment decision are irrelevant to his discriminatory termination claim. The Seventh Circuit has recognized that, in some circumstances, "evidence surrounding a previous employment decision such as a demotion would be relevant to and probative of

an employer's intent in a subsequent termination decision." *Fortier v. Ameritech Mobile Commc'n, Inc.*, 161 F.3d 1106, 1112 (7th Cir. 1998). Accordingly, we consider the facts related to Revere's demotion decision in a contextual sense in our analysis of Mr. Glass's discriminatory termination claim.

As discussed above, following the Seventh Circuit's decision in *Ortiz*, the ultimate question in discrimination cases such as this one "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. In making this determination, district courts are to assess all of the evidence presented by the plaintiff "as a whole." *Id.* Here, Mr. Glass argues that the following evidence collectively points to a discriminatory motive for his termination: (1) the circumstances surrounding his demotion; (2) Revere's failure to promote him following his demotion to any supervisory position for which he applied; (3) Revere's inconsistent application of its disciplinary and drug testing policies; and (4) suspicious circumstances surrounding his termination. For the reasons detailed below, after a careful review of the evidence, we find that no reasonable jury could conclude that Mr. Glass's termination was the result of race or age discrimination against him by Revere.

Initially, we note that there is no evidence that Revere employees or supervisors used racially hostile or insensitive terms or made any inappropriate age-related comments to Mr. Glass or any other Revere employee that would raise an inference of racial or age-based animus. To support his discrimination claim, Mr. Glass instead relies primarily on

evidence that he contends demonstrates that Revere treated similarly-situated non-African-American and/or younger employees more favorably than he. It is true that evidence which demonstrates that similarly-situated employees outside of the plaintiff's protected class received more favorable treatment can raise an inference of discrimination. However, Mr. Glass has failed to adduce evidence that raises such an inference here. In fact, in many cases, the record is devoid of incidents of unequal treatment and the evidence that is cited actually contradicts his contentions.

For example, Mr. Glass's contention that Revere treated him less favorably than his white comparators with regard to its drug testing policy is not borne out by any evidence. Mr. Glass contends that after he was involved in a forklift collision with a white co-worker, Kyle Dalton, he was drug-tested while Mr. Dalton was not. However, Revere has presented documentary evidence demonstrating that both Mr. Glass and Mr. Dalton were in fact drug tested on the exact same day following the forklift incident. This evidence has gone unrefuted by Mr. Glass and clearly establishes that Revere did not treat him less favorably than his white co-worker.[4]

---

[4] Mr. Glass contends that in another instance Revere required an African-American employee, Shaun Bryant, to undergo drug testing following a slip-and-fall accident at work, but did not require a white employee, Misty Clifton, to submit to drug testing following a similar slip-and-fall accident. Revere contends that it requires drug testing only when the incident involves an injury and Mr. Bryant was injured when he fell while Ms. Clifton was not. Although there is an issue of fact regarding whether Ms. Clifton was in fact injured following her fall, even assuming that she was hurt, the fact that Revere may on one occasion have applied its drug-testing policy inconsistently is insufficient to raise an inference that Revere discriminated against Mr. Glass.

With regard to Mr. Glass's claim that, following his demotion, he was not selected for any supervisory position for which he had applied because of his race and/or age, he has failed to provide any details regarding the specific positions for which he applied, the identities of the other employees who applied for those positions, or the identities of the individuals who actually received the jobs. At his deposition, Mr. Glass testified only that he had applied for "numerous positions," including "a lead position two or three times," but, other than one supervisory position in production, he was unable to recall which other positions he applied for, who else applied, or who was ultimately selected. Glass Dep. at 199-200. These vague assertions, unsupported by any specific evidence regarding the identities and qualifications of the individuals who ultimately filled the positions Mr. Glass sought are wholly insufficient to raise an inference of discrimination.[5]

Mr. Glass also relies on the circumstances surrounding his demotion and ultimate termination to support his discrimination claim. However, nothing about the circumstances surrounding his demotion or termination raises an inference of discrimination. With regard to his demotion, the evidence clearly demonstrates that during the period of time when Mr. Glass held the position of shipping and receiving lead

---

[5] Mr. Glass submitted a number of affidavits from various other Revere employees stating that Revere has a practice of discriminating against African-Americans with regard to promotions. However, while Mr. Glass has identified the names of a few employees he claims were denied promotions for discriminatory reasons, he again has failed to provide any further detail about the circumstances regarding their treatment and has failed to adduce any evidence regarding the positions these individuals applied for and were denied, their qualifications, or the identities and qualifications of the individuals who filled the positions they sought.

there were significant issues in the shipping and receiving department, particularly with regard to the accuracy of invoices and problems with untimely shipping. Revere maintains that this is its nondiscriminatory reason for demoting Mr. Glass in January 2013.

Although Mr. Glass contends that he was not the cause of those discrepancies and was, in fact, performing satisfactorily at the time he was demoted, the question before us is not whether Revere made the right decision in demoting him but only whether that decision was motivated by Mr. Glass's age or race. *See Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) ("[Courts] do not sit as a superpersonnel department where disappointed … employees can have the merits of an employer's decision replayed to determine best business practices.") (internal quotation marks and citations omitted). Beyond Mr. Glass's own self-serving statements, no such evidence exists here. In fact, Mr. Glass arguably was treated *more* favorably than Mr. McAllister, Mr. Glass's white supervisor in the shipping and receiving department, who was terminated as a result of the same problems in the department on January 7, 2013, approximately one week after Mr. Glass was demoted.

Likewise, with regard to Mr. Glass's termination, our only concern is whether the circumstances surrounding his firing raise an inference of discrimination, not whether Revere made the proper business decision in terminating him. Revere's proffered non-discriminatory reason for Mr. Glass's termination is that he broke company policy by leaving the job on October 6, 2014 without first receiving permission from the acting

supervisor, Mr. Howard.  Mr. Glass concedes that at the time of his termination it was Revere's policy that employees were required to receive permission from a supervisor before an early departure.

Mr. Glass himself testified that, at 11:30 p.m. on the night of October 6, he made the decision to leave work early and the undisputed evidence shows that he clocked out a few minutes later, at 11:38 p.m., when he contemporaneously texted Mr. Howard to inform him that he was leaving because he was not feeling well.  It is also undisputed that by the time Mr. Howard acknowledged Mr. Glass's text at 12:23 a.m., Mr. Glass had already left the work premises.  When Revere conducted its investigation into the circumstances surrounding Mr. Glass's early departure, it had before it this evidence, coupled with Mr. Howard's text to Ms. Fountain the next morning, stating that Howard was not aware of Mr. Glass's departure until he received Mr. Glass's text and the second shift forklift driver, James Burch, informed him that Mr. Glass was gone.

Mr. Glass has since come forward with Mr. Burch's declaration in which Mr. Burch testifies that, at some point that night, Mr. Glass had in fact "approached [Mr.] Howard and me to let us know he was leaving early."  Dkt. 98-1 at 2.  However, there is no indication that Mr. Burch came forward with this information at the time Revere was conducting its investigation into Mr. Glass's conduct or that Revere otherwise had knowledge of this information and ignored Mr. Burch's recollection in making its termination decision.  Accordingly, the evidence adduced as a part of the record before us

supports the conclusion that, at the time it terminated Mr. Glass's employment, Revere honestly believed that he had violated company policy against job abandonment.

Nor is there any other indication that Revere's proffered reason for Mr. Glass's termination was a pretext for discrimination. Although Mr. Glass contends that Misty Clifton, a younger, white supervisor, was treated more favorably when she was not terminated after threatening to walk off the job, Revere has submitted evidence establishing that Ms. Clifton was, in fact, terminated after she made such a threat. Mr. Glass has submitted no other evidence that would show that his termination was the result of unlawful discrimination.

For these reasons, viewing the evidence as a whole, Mr. Glass has failed to adduced evidence from which a reasonable jury could find that his termination was based on his age or race. Accordingly, Revere is entitled to summary judgment on Mr. Glass's discriminatory termination claim.

### B.     Retaliation

Mr. Glass also claims that he was terminated in retaliation for "having complained of discrimination and for filing a workers compensation claim." Am. Compl. ¶ 39. Although not entirely clear from his briefing based on this allegation, we understand Mr.

Glass to be alleging both a Title VII retaliation claim as well as a state law claim for wrongful termination under Indiana law.[6] We address these theories in turn below.

### 1. Title VII Retaliation

Title VII prohibits an employer from retaliating against an employee for engaging in acts protected by that statute. 42 U.S.C. § 2000(e)-3(a). To prove retaliation, a plaintiff must present evidence that would allow a reasonable juror to conclude that he was retaliated against and suffered an adverse employment action because he engaged in statutorily protected activity. *Williams v. Office of Chief Judge of Cook Cty., Ill.*, 839 F.3d 617, 627 (7th Cir. 2016). Here, there is no dispute that Mr. Glass engaged in statutorily protected activity when he made a series of complaints of race discrimination to Mr. Kellogg, Ms. Robinette, and Mr. Yurkovich during his employment with Revere, the last of which was lodged in September 2013, and also when he filed multiple charges with the EEOC. Nor is there any dispute that Mr. Glass was subjected to an adverse employment action when he was terminated in October 2014. However, Mr. Glass's Title VII retaliation claim cannot survive summary judgment because he has failed to adduce sufficient evidence to raise a genuine issue of material fact as to causality.

Mr. Glass does not point to any evidence that would support an inference of a causal connection between his complaints and his termination. In fact, the evidence

---

[6] Insofar as Mr. Glass also alleges a retaliation claim under the ADEA, that claim fails because there is no evidence that he ever engaged in protected activity under the ADEA. *See Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011) ("To prove retaliation in violation of the ADEA, [the plaintiff] must show that he engaged in statutorily protected activity, that he suffered a materially adverse action, and that the two are casually related.").

establishes that, rather than retaliate against him following his complaints, Revere conducted investigations into each of his allegations. Mr. Glass himself testified by deposition that both Mr. Kellogg and Mr. Yurkovich fairly and appropriately responded to his complaints of discrimination. Glass Dep. at 200-01, 210. A plaintiff can in some cases establish a causal link through evidence that the protected activity and discharge took place in close succession. *Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir. 1991). Here, however, the substantial amount of time that passed between Mr. Glass's protected activity in September 2013 and his discharge almost a full year later in October 2014 defeats any possible inference of retaliatory causation. *See Porter v. City of Chi.*, 700 F.3d 944, 957-58 (7th Cir. 2012) (holding that a time span of nearly one year between protected activity and adverse employment action "does not suffice to show a causal connection") (collecting cases). Accordingly, Mr. Glass's Title VII retaliation claim is dismissed.

### 2.     Workers' Compensation Retaliation

In his Amended Complaint, Mr. Glass alleges claims under Indiana law for wrongful termination and retaliation based on his having been terminated after he filed a workers' compensation claim. The Seventh Circuit has recognized that "an employee who has been discharged in retaliation for filing a claim of workers' compensation may recover damages for wrongful termination." *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002).

To survive summary judgment in a workers' compensation retaliation case, "an employee must show more than a filing of a worker's compensation claim and the discharge itself." *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 213 (Ind. Ct. App. 2005). "The employee must present evidence that directly or indirectly supplies the necessary inference of causation between the filing of a worker's compensation claim and the termination." *Id.* Some examples of such evidence include "evidence of the proximity in time between the filing of the claim and the termination, or evidence that the employer's asserted lawful reason for discharge is a pretext…." *Id.*

Although again it not being entirely clear from his response, it appears that Mr. Glass's argument that he was wrongfully terminated under Indiana law rests primarily on his contention that Defendant induced Dr. Pennington at Business Health Plus to provide a false medical opinion that Mr. Glass's injury was the result of a preexisting condition as opposed to an on-the-job incident in order to deny his worker's compensation claim and then terminate him. However, Mr. Glass cites no evidence in support of this theory beyond his own subjective belief. Nor is the fact that Mr. Glass was terminated only a few days after he submitted his request for worker's compensation, without more, sufficient to raise an inference of retaliation, particularly given that the investigation into his having left work early without permission had already been commenced at the time. Indiana courts have made it clear that temporal proximately alone "rarely creates a jury issue on causation." *Crye v. Caterpillar, Inc.*, No. 4:07-cv-35-AS-APR, 2008 WL 5111349, at *7 (N.D. Ind. Dec. 3, 2008) (evaluating a worker's compensation retaliation

claim under Indiana law).  Because Mr. Glass has presented no evidence to link the filing of his worker's compensation claim to his termination beyond mere temporal proximity, his wrongful termination claim under Indiana law cannot survive summary judgment.

## III.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  Final judgment shall issue accordingly.

IT IS SO ORDERED.


Date: _____6/2/2017_____          _Sarah Evans Barker_____
                                                     SARAH EVANS BARKER, JUDGE
                                                     United States District Court
                                                     Southern District of Indiana

Distribution:

RONALD  GLASS
PO Box 727
New Albany, IN 47151

Stephen L. Richey
THOMPSON HINE LLP -- Cincinnati
stephen.richey@thompsonhine.com